UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES A. HENDRIX,<br><br>             Plaintiff,<br><br>   v.<br><br>LEO BRANTON, JR., et al.,<br><br>             Defendants. | CASE NO. C93-537-TSZ-RSM<br><br>ARBITRATION ORDER |

## I. INTRODUCTION

This matter comes before the Court for post-settlement arbitration. Petitioners are Alan Douglas and Gravity, Inc. Respondent is Experience Hendrix L.L.C. ("Experience Hendrix). The dispute involves a documentary film and biography of Jimi Hendrix produced in the 1990s by Mr. Douglas entitled "Room Full of Mirrors" ("RFOM") and a biographical film recently produced and currently being distributed by Experience Hendrix entitled "Voodoo Child." Pursuant to an agreement between the parties, Petitioners agreed to release and terminate their claims and rights relating to RFOM under the condition that Experience Hendrix and other

parties not produce a film similar in form or substance to RFOM. Petitioners contend that Respondent's release of Voodoo Child violates this agreement. As more fully set forth below, the Court agrees with Petitioners. Pursuant to the parties' agreement, this decision is "final and binding on the parties, without right of appeal in any forum." Dkt. #1909, Ex. A.

## II. DISCUSSION

**A. Background**

James Allen "Al" Hendrix filed the underlying action in 1993, suing Alan Douglas and multiple corporate defendants for ownership and control of the music and other rights of famed musician Jimi Hendrix. The lawsuit ultimately ended up in a settlement in which Mr. Douglas and the other defendants gave Al Hendrix all ownership and rights in Jimi Hendrix music and properties in exchange for a substantial sum of money. See Dkt. #1929, Ex. A ("1995 Settlement Agreement"). As part of the settlement, Al Hendrix formed Experience Hendrix L.L.C. and Authentic Hendrix, L.L.C. to hold, manage and license rights related to Jimi Hendrix.

At the time of the 1995 Settlement Agreement, Mr. Douglas had completed a biographical book about Jimi Hendrix entitled "Room Full of Mirrors," and had partially completed a film documentary of the same title. The documentary was a first person narrative account of Jimi Hendrix's life, told in his own words. The 1995 Settlement Agreement contemplated that Mr. Douglas would retain some rights in both of those works:

> (A) <u>The Documentary.</u> Mr. Douglas represents that he has completed a book entitled "Room Full of Mirrors," and partially completed a film documentary of the same title, and that he wishes to produce a soundtrack album derived only and directly from the film documentary (collectively, the film documentary, soundtrack and book shall be referred to herein as the "Documentary"). On or before October 1, 1995, Mr. Douglas agrees to present his work to date on the Documentary to Plaintiff, or his designee, and Plaintiff, or his designee, shall have the right to approve or disapprove the completion and/or exploitation of the Documentary (and each element thereof). If Mr. Douglas and Plaintiff, or his designee, disagree with

> respect to the commercial or artistic acceptability of continuing production work on the Documentary or with respect to any aspect of the production, management or exploitation of the Documentary, the issue or issues in contention shall be submitted to arbitration in accordance with Section 1.10.(c) below. The responsibility to finance the production of the Documentary shall be borne solely by Mr. Douglas, and all reasonable costs of the Documentary shall be recouped by him if the Documentary is commercially exploited. If it is decided, in accordance herewith, to produce the Documentary, Mr. Douglas expects to complete all of his production work on the Documentary working with copies of the original films and music, and he shall return to the Company all such copies and any other Hendrix Properties used in such work, upon completion of the Documentary. In the event that Mr. Douglas requires any original Hendrix Properties to complete the Documentary, he shall work with such Properties only at a studio or other site approved by the Company.
>
> \* \* \*
>
> (E) Profits. In consideration of Mr. Douglas's performance of all of his obligations under this Section 1.10, he shall be entitled to receive an amount equal to fifty percent (50%) of all net profits, if any, received by Plaintiff as a result of the exploitation of the Documentary by the Company. The amounts owing to Mr. Douglas pursuant to this Section 1.10 shall constitute an unsecured contractual obligation of the Company and shall not confer on Mr. Douglas any ownership interest in either the Documentary or the Album.

1995 Settlement Agreement, ¶1.10.

Pursuant to this agreement, Mr. Douglas provided rough cuts of the book and film RFOM to Janie Hendrix as designee of Al Hendrix. Janie Hendrix, Troy Wright (Janie's then husband) and John McDermott (Respondent's full-time Hendrix archivist and subsequent writer and co-producer of Voodoo child) also travelled to London to view the rough cut and discuss the Hendrix family's response to RFOM with Mr. Douglas and the film's director, Peter Neal.

Ultimately, Experience Hendrix rejected RFOM in its current form and requested that Mr. Douglas make certain specified changes. Notably, one of the aspects of RFOM that Experience Hendrix asked to be changed was the first-person narrative structure of the documentary. *See* Wasson Depo., Ex. 15 ("Having an actor read Jimi's words conveys the

impression of an imitation rather than authenticity."). Mr. Douglas never made any of the changes requested by Experience Hendrix and, in 1996, submitted the dispute to arbitration along with other claims that had arisen between the parties related to the 1995 Settlement. Ultimately, as a result of Judge Dwyer's rulings, the parties' negotiations, and Respondent's rejection of the RFOM book and film, the parties executed a second agreement in 1997. Dkt. #1933, Ex. 2 (the "1997 Settlement Agreement"). The portion of the 1997 Agreement relevant to this dispute provides:

> The Corporate Defendants and the Douglas Parties agree to, and do hereby, release and terminate all of their claims and rights relating to the documentary film, book and soundtrack album entitled "Room Full of Mirrors," as such claims and rights are described in Section 1.10 of the Settlement Agreement, provided, however, that as a material condition to such agreement to release and terminate such claims and rights by the Corporate Defendants and the Douglas Parties, the Hendrix Parties warrant, represent and agree that they shall not, directly or indirectly, produce and/or exploit or authorize others to produce and/or exploit an audio-visual recording, video or film which is similar in form or substance to the "Room Full of Mirrors" film contemplated by the Corporate Defendants and the Douglas Parties, as such contemplated film appears in the "Rough Cut" embodied in the video cassette attached hereto as Exhibit A and by this reference incorporated herein. Notwithstanding the provisions of this paragraph 4(C) to the contrary, if at some time in the future the Hendrix Parties desire to exploit "Room Full of Mirrors" in its current form or a version similar to the existing format, they shall so notify the Corporate Defendants and the Douglas parties, in writing and in such event the provision of section 1.10(A), (C), (D) and (E) of the Settlement Agreement shall be deemed binding upon the parties, provided that the net profits resulting from the exploitation of the "Documentary" (as such term is defined in Section 1.10A of the Settlement Agreement) shall be split equally between Experience, on the one hand, and Gravity, on the other hand.

Id. at ¶4(C).

Between 1996 and 2010, Experience Hendrix produced six full length and six short form documentaries about Jimi Hendrix's life and musical career. None of these films utilized a first person storytelling technique or told Jimi Hendrix's life story from beginning to end.

In 2008, Janie Hendrix and Mr. McDermott began to produce the Jimi Hendrix documentary film, Voodoo Child. Mr. McDermott wrote the initial script for Voodoo Child and provided it to director Bob Smeaton, who edited and directed the film. Mr. McDermott had seen the RFOM rough cut prior to working on Voodoo Child; Mr. Smeaton had not.

Voodoo Child was released in 2010. Janie Hendrix and Mr. McDermott testified that Voodoo Child was the first Jimi Hendrix documentary film that they or anyone else had ever released using the first person narration or "autobiographical" format. It was also the first documentary that Experience Hendrix had released that documented Jimi's entire life. It was purportedly based on a 2007 book "Jimi Hendrix: An Illustrated Experience" by Janie Hendrix and Mr. McDermott. That book and the film both used a scrapbook effect to reveal details of Jimi's life from early childhood to death, reproducing Jimi's letters, postcards, and drawings in their original format.

Respondent contends that RFOM was neither an inspiration nor a resource for any part of Voodoo Child. Jimi's public life was very short, beginning in June 1967 with his appearance at the Monterey Pop Festival in June 1967 and ending in September 1970 with his untimely death at 27. He was a prolific writer of letters and poetry, but gave few videotaped or television interviews. Thus, there are relatively few recorded expressions of Jimi's spoken or written thoughts. Respondent argues that this is why it reached the decision to create a documentary of Jimi's life using his own written words coupled with images captured during his lifetime. Respondent also points to other films such as "Tupac: Resurrection" (2003) and "George

1 Harrison: Living in the Material World" (2011) as evidence of other documentary films that have
2 used a similar first-person narration style.
3     The Douglas parties argue that the release of Voodoo Child was a material breach of the
4 1997 Settlement Agreement because it is similar in both form and substance to RFOM.
5 Accordingly, in 2011, the Douglas parties demanded that Respondent submit the matter for
6 arbitration. The parties ultimately stipulated to arbitration and this Court was appointed by
7 Judge Zilly to serve as the Judicial Arbitrator.
8 **B.   Motion to Seal**
9     Respondent moves to file the 1995 Settlement Agreement under seal. Petitioner does not
10 oppose the motion. "There is a strong presumption of public access to the court's files." Local
11 Rule CR 5(g)(1). Parties seeking an order to seal any document must seek prior authorization to
12 do so. Local Rule CR 5(g)(3). "A motion or stipulation to seal shall provide … a clear
13 statement of the facts justifying sealing and overcoming the strong presumption in favor of
14 public access." Local Rule CR 5(g)(4). *See also Kamakana v. City & County of Honolulu,* 447
15 F.3d 1172, 1180 (9th Cir. 2006). To obtain a court order sealing documents attached to a
16 summary judgment or other dispositive motion, the parties must meet a "compelling reasons"
17 standard rather than the lesser "good cause" standard. *Kamakana* , 447 F. 3d at 1177-79; *Foltz v.*
18 *State Farm Mutual Automobile Insurance Co.*, 331 F. 3d 1122, 1136 (9th Cir. 2003); Local Rule
19 CR 5(g)(2).
20     Here, the 1995 Settlement Agreement contains a confidentiality provision prohibiting the
21 disclosure of financial terms in the agreement except under certain circumstances. This
22 Arbitration does not meet one of the exceptions. Financial terms are included throughout the
23 1995 Agreement. Therefore, redacting all financial information from the agreement would not
24 allow the Court the opportunity to review the full Agreement. Nor is there an overriding need

for the public to know the intricate financial details of the 1995 Settlement Agreement. The Court finds that there are compelling reasons to file the 1995 Settlement Agreement under seal as it will effectuate the terms and purpose of the Agreement and the goals of the Court. Respondent's motion (Dkt. #1924) is hereby GRANTED. Dkt ## 1930 & 1931 shall remain under seal.

**C.     Motions to Strike**

Respondent moves to strike the declarations of Petitioners' expert witnesses, John Masouri and Sandy Lieberson. Respondent contends that Petitioners agreed that they would only retain one expert witness and that they would file a declaration containing all expert opinions that Petitioners would rely on in their opening brief. Petitioners, however, retained two expert witnesses, and, according to Respondent, filed final declarations in conjunction with their opening brief that contained new opinions not previously disclosed, including criticisms of the expert opinions of Mr. Stolt, Respondent's expert witness.

The motion to strike Petitioner's experts' declarations is denied. Respondent knew that Petitioner had designated two expert witnesses early in discovery. The time to object to Petitioner's decision to designate two experts rather than one was then. With respect to Respondent's other contention, the Court finds that Petitioner's experts did not express new opinions in the declarations submitted to the Court. Rather, they expressed the same opinions they expressed in the original declarations submitted to Respondent (see 2nd Wilson Decl., Ex. F) and additionally responded to Mr. Stolt's declaration. To the extent that this violated the parties' agreement, the Court finds that it is not prejudicial to Respondent as the responses to Mr. Stolt are essentially argument that could have been, and was, made by Petitioner's attorney.

Respondent also moves to strike Petitioner's surreply to Respondent's reply brief (Dkt # 1943). The motion is denied. Respondent raised new arguments in its reply brief that were not

raised in its opening brief. Respondent's opening brief focused on whether the two films were similar and whether the contractual provision at issue constituted an unreasonable restraint on trade. Respondent's reply brief argued that the 1997 Agreement does not provide equitable remedies or incorporate the equitable remedy provisions from the 1995 Agreement. Most importantly, all of these issues were addressed at the arbitration hearing by both sides. Accordingly, striking Petitioner's surreply at this junction would not serve any purpose.

**D. Breach of Contract**

This is a contractual dispute. The Court must determine whether Respondent's production and release of Voodoo Child constitutes a breach of the parties' agreements. The 1997 Agreement provides that, as a "material condition" of the Douglas' Parties' transfer of all remaining rights in RFOM, the Hendrix Parties "shall not… produce and/or exploit an audio-visual recording, video or film which is *similar in form or substance* to the "Room Full of Mirrors" film." 1997 Agreement at ¶4(c) (emphasis added). The parties disagree as to the meaning of the phrase "similar in form or substance."

"The touchstone of contract interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 128 Wash.2d 656, 674 (1996). Washington courts follow the objective manifestation theory of contracts, looking for the parties' intent as objectively manifested rather than their unexpressed subjective intent. *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503 (2005). Thus, a court considers only what the parties wrote, giving words in a contract their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates a contrary intent. *Id*. at 504. Further a court "must read [a contract] as the average person would read it; it should be given a practical and reasonable rather than a literal interpretation, and not a strained or forced construction leading to absurd results." *Allstate Ins. Co. v. Hammonds*, 72 Wash. App. 664, 667 (1994). This meaning

may be ascertained by reference to standard English dictionaries. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wash.2d 50, 77 (1994). The court harmonizes clauses that seem to conflict in order to give effect to all the contract's provisions. *Nishikawa v. U.S. Eagle High, LLC*, 138 Wash. App. 841, 849 (2007). And it interprets settlement agreements in the same way as it interprets other contracts. *Riley Pleas, Inc. v. State*, 88 Wash.2d 933, 937-38 (1977).

1. <u>The 1997 Agreement Applies to Films Other Than RFOM</u>

Respondent's first argument is that the 1997 Agreement was not intended to preclude Respondent from producing and paying for their own documentary about Jimi's life, but only to prevent the release of RFOM itself, which Mr. Douglas had spent considerable resources in developing . Respondent argues that the language following the phrase "similar in form or substance" clarifies the parties' intent in this regard: namely, that "if at some time in the future the Hendrix Parties desire to exploit 'Room Full of Mirrors' in its current form or a version similar to the existing format, they shall so notify the Corporate Defendants and the Douglas parties" and the released rights under § 1.10(A) of the original settlement would be reinstated. Since Experience Hendrix never exploited RFOM itself, Respondent never needed the § 1.10(A) services that Mr. Douglas agreed to perform if RFOM were exploited, nor was it required to avail itself of those services.

The Court finds this interpretation of the contract untenable. Washington courts favor an interpretation giving effect to all of a contract's provisions over one that renders some language meaningless or ineffective. *See Newsom v. Miller*, 42 Wn.2d 727, 731 (1953). If the Court were to interpret the parties' agreement in the manner suggested by the Respondent, the language regarding the Hendrix Parties' agreement not to exploit a film "similar in form or substance" to RFOM would be entirely superfluous. Indeed, such an interpretation renders all of the language on page 3 of the agreement between "represent and agree that" on line 5 and "if at some time in

the future" on line 11 redundant. This is not a practical and reasonable reading of the contract and is rejected by the Court.

2. The Word "Similar" Should Be Given Its Ordinary Meaning

Respondent's second argument is that, even if the 1997 Agreement imposed restrictions on Experience Hendrix to produce a documentary that was "similar" to RFOM, Voodoo Child is not similar. To reach this conclusion, Respondent asks the Court to interpret the word "similar" to mean "substantially similar" as that term of art is defined under Ninth Circuit copyright infringement precedent.[1]

There are several reasons why the Court declines to interpret the term "similar" in the manner advocated for by the Respondent. First, there is no indication elsewhere in the contract that the parties intended to import the highly technical copyright term of art, "substantially similar," when it employed the term "similar" in the 1997 Agreement. Presumably, if the parties intended to use this particular definition of the word "similar," they could have said so.

Second, both parties concede that Petitioner transferred any intellectual property rights it held in RFOM via the 1995 Agreement. Therefore, the rights involved in the 1997 Agreement are purely contractual. It would seem particularly "strained or forced" to interpret the word

---

[1] The Ninth Circuit has developed a two pronged test for determining in a copyright infringement action whether one work is substantially similar to another, whereby the court first looks to the "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" to determine whether one work is objectively "similar" to the other. *Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir. 1994). The second, subjective portion of the test is whether an "ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works." *Benay,* 607 F.3d at 624 (internal quotations omitted). "Under the 'inverse ratio' rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work." *Id.* at 624. However, "[s]ince an idea cannot be copyrighted, a concept for a film or television show cannot be protected by a copyright." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (citing 17 U.S.C. § 102).

"similar" as a copyright term of art in the context of a transfer of purely contractual rights. *See Hammonds*, 72 Wash. App. at 667.

Third, even in those cases in which copyright infringement claims are involved, the Ninth Circuit has been careful to differentiate between the level of similarity that is required to prove infringement, and the level of similarity that is required to prove a breach of contract. *See Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 630 -631 (9th Cir. 2010) ("In breach of contract claims, the level of similarity that permits an inference of actionable use depends on the nature of the agreement between the parties.") (citing 4 Nimmer § 19D.08). This differentiation arises out of the fact that a party can protect ideas and expression via contract that it could not protect under copyright law. *See Benay*, 607 F.3d at 631 ("There is nothing unreasonable in the assumption that a producer would obligate himself to pay for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he would be unable to use but for the disclosure.") (internal citation omitted); *see also Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) ("Since an idea cannot be copyrighted, a concept for a film or television show cannot be protected by a copyright. 17 U.S.C. § 102. But the concept can still be stolen if the studio violates an implied contract to pay the writer for using it.").

A contract provision is ambiguous when its terms are uncertain or when its terms are capable of being understood as having more than one meaning. *Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc.,* 76 Wash.App. 267, 275 (1994), *review denied,* 127 Wash.2d 1003 (1995). A provision, however, is not ambiguous merely because the parties suggest opposing meanings. *Id.* "[A]mbiguity will not be read into a contract where it can be reasonably avoided." *McGary v. Westlake Investors,* 99 Wash.2d 280, 285, 661 P.2d 971 (1983).

Here, although the word "similar" is a broad term, it is not inherently ambiguous. *See BDK, Inc. v. Escape Enterprises, Inc.*, 106 Fed.Appx. 535, 539, 2004 WL 1398603, *3 (9th Cir. 2004) (affirming district court's order upholding terms of non-competition agreement prohibiting Defendant from operating a restaurant that sells food products *similar* to that offered by Plaintiff within a three-mile radius of Plaintiff's restaurants and affirming corresponding injunction). Any ambiguity can be reasonably avoided by using the common definition of the term. *See Paul v. Stanley*, 168 Wash. 371, 378 (1932) (interpreting the word "similar" in a court decree to mean "having a general likeness," as defined in Webster's New International Dictionary of the English Language). The Merriam-Webster Online Dictionary defines "similar" as "having characteristics in common." The Court will employ this common definition of "similar" in interpreting the parties' contract.

    3.   <u>The Contractual Provision is not an Unreasonable Restraint on Trade</u>

Finally, Respondent argues that the contractual restriction on Experience Hendrix's ability to produce a "similar" film and book to RFOM constitutes an illegal restraint of trade. The public policy against unreasonable restraints of trade is generally raised in three contexts: employment relationships, the sale of a business, and the sale or transfer of real property. Respondent offers no case law to support its contention that the public policy against unreasonable restraints on trade applies to works of creative expression. To the contrary, the case law is replete with instances of courts recognizing breach of contract claims against defendants who agreed to compensate artists for using an idea but did not do so. *See, e.g., Benay*, 607 F.3d at 630*; Donahue v. Ziv Television Programs, Inc.*, 245 Cal.App.2d 593, 597, 601 (1966). The Court has found no instance in which such a contract was viewed by the Court as an unreasonable restraint of trade.

The Court recognizes this case is different than the typical case in which an artist seeks to protect the exploitation of his or her idea. In a typical artist/producer case, the contractual requirement that the producer pay the artist for his or her idea does not prevent the artist from selling the idea to a third party. Here, however, Respondent holds all of the intellectual property required to exploit Petitioners' idea. Petitioner cannot sell the idea to anyone else because no one except for Respondent has the rights required to exploit the idea. And Respondent is not permitted under the contract to exploit the idea itself unless it does so with the participation of the Petitioners. In other words, if Respondent does not want to work with the Petitioners, it cannot exploit the idea, and nobody else can either.

While this provision is unusual, the parties agreed to it. There is no reason to believe that it contravenes any public policy. To the extent that it constitutes a restraint on trade, the restraint is reasonable. *See Armstrong v. Taco Time Intern., Inc.*, 30 Wash. App. 538, 543-544 (1981) ("In this State, our courts will enforce a restriction to the extent it is reasonable."). The only reason that the provision extends to third parties is because of monopoly rights tied to the intellectual property required to exploit the idea – monopoly rights that Respondent holds. Respondent's monopoly will eventually expire, providing a natural time limitation on the restrictions as to third parties. *See Sheppard v. Blackstock Lumber Co.*, 85 Wash. 2d 929, 933 (1975) (holding that covenants not to compete in employment agreements are enforced to the extent they are reasonable and lawful, giving special consideration to time and area restrictions). The provision will be enforced.

4. <u>The Two Films are Similar in Both Form and Substance</u>

The Court now turns to the question of whether Voodoo Child is similar in form or substance to RFOM. After viewing the two films, listening to all of the testimony at the arbitration hearing, hearing argument from both sides, and reading the declarations and exhibits

filed in connection with this arbitration proceeding, there is no question in the Court's mind that Voodoo Child is similar, in *both* form and substance.

The parties are familiar with the similarities between the two films and the Court will not recount them here in detail. In essence, both films use a first person narration format to tell the story of Jimi Hendrix's life "in his own words". In both films, an actor was hired to read excerpts of letters and notes and interviews that Jimi produced during his lifetime as a voiceover while images of Jimi's concerts, contemporaries, and Jimi himself are shown in roughly chronological order. In both films, the songs that are played are played in roughly the same order, the quotes that are read are read in roughly the same order, and the stock images that are used are used in roughly the same order, in the same way, in connection with the same periods of Jimi's life. The similarities between the two films are so remarkable and apparent after even a single viewing that it would be unreasonable for a fact-finder to find that the films were *not* similar in *either* form or substance. *See also* Masouri Decl. ¶¶ 11 – 18 (detailing the similarities in format, plot, theme, sequence, coupling of images and audio, use of archival footage, and other details between the two films).

There are some differences between the two films. For example, Voodoo Child includes visual depictions of Jimi's personal photographs, handwritten poems, and letters home in a "scrapbook" form, whereas RFOM does not. RFOM features portions of interviews of Eric Clapton, John Lee Hooker, Mick Jagger, Jeff Beck, Paul McCartney, Peter Townshend, and others reflecting on Jimi and his career; Voodoo Child does not. There are also other differences not recounted here. These differences, however, are minor in comparison to the similarities between the two films. With respect to the majority of these differences, the Court questions

whether the average viewer would even notice them.  *See also* Lieberson Decl., ¶15 ("The similarities of the two films are so powerful that they override any differences in the films.").

Respondent contends that a major difference between the two films is the theme: that RFOM was intended to put Jimi's life in the context of the 1960s and beyond where as Voodoo Child was intended to provide an intimate look at Jimi Hendrix's life.  *Compare* Ex. G. to Wilson Decl. at 21:21 – 23:4 (Neal Deposition), *and* Ex. F to Wilson Decl. at 118:6-13; 120:13-23 (McDermott Deposition).  To the extent that the directors' intentions were different in producing the two films, these differences are only minimally reflected in the execution of the films.  Again, an average viewer would likely not recognize a significant difference between the themes of the two films.

Respondent also argues that any similarities should be viewed through the lens of Jimi's tragically short music career: that the limited amount of source material necessarily means that any documentary about Jimi's life will contain much of the same footage and recorded speech.  While this may be true, this does not change the language of the contract, which merely prevents the production or exploitation of a film that is "similar" in form or substance to RFOM.  The difficulty of creating a dissimilar film has no bearing on the permissibility of creating a similar one.

Finally, even if the substance of the two films were different, there is no question that the *form* that both films take is similar.  The Merriam Webster Online Dictionary defines form as "the shape and structure of something as distinguished from its material."  Respondent has provided no evidence that the documentaries are different in form. Indeed, Respondent's expert, concedes that "Both RFOM and Voodoo Child use a standard first person narrative technique." Stolt Decl. , ¶ 17.  Here the structure of Voodoo Child – a first-person narrative of Jimi's life and

career told by an actor against a backdrop of images and video from Jimi's life or about Jimi's life, interspersed with recordings of Jimi's music – is similar, if not the same, as the structure of RFOM.

Because Respondent has created a film that is similar in both form and content to RFOM, it has materially breached the 1997 Agreement.

**E.    Remedy**

The Douglas Parties seek equitable relief, including an order allowing the Douglas Parties to release the book and film RFOM (to include royalty-free use of Jimi's music and footage or photos controlled by Respondent), that the Douglas parties be entitled to 100% gross proceeds from RFOM until they have been fully reimbursed for their expenses in creating the book and film, that Respondent be enjoined for one year from any further exploitation or distribution of Voodoo Child, and that Respondent reimburse the Petitioners for their attorneys fees in connection with this arbitration. Respondent argues that the 1997 Agreement does not provide for equitable relief or reference the equitable relief provisions of the 1995 Agreement and that Petitioners' remedy, if any, should be limited to damages.

A brief outline of the parties' two agreements here is helpful.  Under the 1995 Agreement, Mr. Douglas held certain rights with respect to RFOM: (1) the right to present his RFOM to Al Hendrix or his designee for approval; (2) the right to arbitrate any disagreements with respect to exploitation and production of the work; (3) the right to recoup his costs in producing RFOM if it was commercially exploited; (4) the right to use copies of the original films and music to complete production of the documentary; and (5) the right to use original Hendrix property to complete the documentary, if needed, at a studio or other site approved by Al Hendrix's company.  1995 Agreement, ¶1.10(A).

Under the 1997 Agreement, Petitioners released and terminated the above rights. However, a "material condition" of that release was that the Hendrix Parties not produce or exploit a documentary "similar in form or substance" to RFOM. Respondents failed to satisfy that condition when they began production on *Voodoo Child.*

When the Hendrix parties failed to satisfy the condition subsequent in the 1997 Agreement to the release and termination of the rights secured by Petitioners in RFOM, the rights released under the 1997 Agreement reverted back to the Douglas Parties. *See CHG Intern., Inc. v. Robin Lee, Inc.*, 35 Wash. App. 512, 515 (1983) ("A condition must be exactly fulfilled or no liability arises on the promise which it qualifies.") (citing 5 Williston, *Contracts* § 675, p. 184 (3d ed. 1961)). Therefore, Mr. Douglas now retains the same rights he held in RFOM that he did before under the 1995 Agreement.

Now the Court turns to the 1995 Agreement. The rights that Mr. Douglas now retains in RFOM under the 1995 Agreement have been breached. The 1995 Agreement provided:

> "If Mr. Douglas and Plaintiff .. disagree with respect to the commercial or artistic acceptability of continuing production work on the Documentary or with respect to any aspect of the production, management or exploitation of the Documentary, the issue or issue in contention shall be submitted to arbitration…

1995 Agreement, ¶ 1.10. Rather than submitting the matter to arbitration under the terms of the Agreement, Respondent produced a different documentary about Jimi Hendrix's life, similar in form and substance to RFOM, without Douglas's involvement.

Under the 1995 Agreement, the Court is empowered to provide equitable relief:

> 9.5 Equitable Relief. The parties to this Settlement Agreement agree that strict compliance with this Settlement Agreement is necessary and that any break will cause irreparable damages to the other parties incapable of monetary evaluation. Therefore, any party aggrieved by any breach of this Settlement Agreement shall be entitled to obtain redress, including specific performance, injunctive relief and any other available remedy. Time and

> strict performance are of the essence of this Settlement Agreement. Each party hereby waives and agrees not to assert the defense that the aggrieved party has an adequate remedy at law or in damages. This Section shall not affect the aggrieved party's right to also recover any damages it suffers.
>
> 9.6 Remedies. Except as otherwise provided herein, no remedy conferred by any provision hereunder is intended to be exclusive of any other remedy now or hereafter provided by law, and the election of any one or more such available remedies by any of the parties shall not constitute a waiver of the right of such party to other available remedies.
>
> \*   \*   \*
>
> 9.8 Attorney's Fees. In any dispute concerning or arising under this Settlement Agreement after the execution thereof, the prevailing party shall be entitled to reasonable attorneys' fees, expenses and costs.

Accordingly, the Court will provide equitable relief. In doing so, the Court attempts to put the parties back in the position they would have been in had Respondent worked with Petitioners in producing and exploiting a documentary about Jimi Hendrix's life, rather than producing a separate documentary on their own. At the same time, the Court does not believe that further cooperation between the parties is possible or desirable and that the most favorable outcome of the present dispute would be one in which the interaction between the parties could be held to an absolute minimum.

"Equitable principles … allow a court, under appropriate circumstances, to enforce some parts of a contract but not others, or with cause, to order performance different in some respects from that set out in the contract." *Gatewood v. U.S. Cellular Corp.,* 953 F.2d 1393, 1397 (1992) (citing *Castle v. Cohen,* 840 F.2d 173, 180 (3d Cir.1988); 5A Arthur Corbin, *Corbin on Contracts* § 1137 (1964)). Courts may enforce part but not all of an agreement either to fulfill the parties' actual intention, *see, e.g., Grand Union Co. v. Cord Meyer Dev. Co.,* 761 F.2d 141 (2d Cir.1985); *Premier Indus. Corp. v. Texas Indus. Fastener Co.,* 450 F.2d 444 (5th Cir.1971), or to remedy harm caused by unconscionable or inequitable conduct by one of the parties, *see, e.g.,*

*Grand Union Co. v. Cord Meyer Development Co.,* 761 F.2d 141, 147 (1985); *McFarland v. Gregory,* 322 F.2d 737, 739 (2d Cir.1963). Here, the court finds Respondent's conduct in producing a film that mirrors that of Mr. Douglas's, without compensation, notice, or attribution, in direct contravention of the parties' 1997 Agreement, constitutes inequitable, unconscionable conduct. To that end, the Court grants the following relief:

(1) Petitioners are hereby permitted to release to the public the book and film Room Full of Mirrors (such exploitation to include the royalty-free use of Jimi Hendrix's music and any included footage or photos owned or controlled by Respondent), without any input or interference of any kind from Respondent, its agents, lawyers, representatives or assignees. Petitioners shall use copies of the original films and music to complete production of RFOM and shall return to Experience Hendrix all such copies and any other Hendrix Properties used in the work upon completion of the Documentary. In the event that the Petitioners require any original Hendrix properties to complete the documentary, they shall be given access to such properties, and they shall work with such properties only at a studio or other site approved by Experience Hendrix.

(2) The book and the film Room Full of Mirrors shall contain a disclaimer, the text of which must be easily legible by the average reader or viewer and, in the case of the film, must be displayed for sufficient time for the average reader to complete reading it. The disclaimer shall state that the book and film Room Full of Mirrors was produced without the input, assistance, or authorization of Al Hendrix, Janie Hendrix, Experience Hendrix, L.L.C., or any parties associated therewith.

(3) Petitioners, upon receipt of any funds from their distribution or exploitation of either the book or film Room Full of Mirrors, shall be entitled to one hundred percent (100%) of the gross proceeds of such distribution.

(4) Petitioners are entitled to reasonable attorneys' fees, expenses and costs. Petitioners shall submit a sworn and signed declaration, supported by evidence, attesting to the amount of attorneys' fees, expenses and costs accrued in the course of this arbitration proceeding within 30 days of the date of this order.

## III. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Respondent's motion to seal (Dkt. #1924) is hereby GRANTED. Dkt ## 1930 & 1931 shall remain under seal.

(2) Petitioner is entitled to the relief as set forth above.

(3) The Clerk is directed to forward a copy of this Order to plaintiffs and to all counsel of record.

DATED June 26, 2012.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE